IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RHONDA MASTON-MEADOWS, on behalf of
herself and all others similarly situated,

          Plaintiff,

   v.

KONINKLIJKE PHILIPS N.V., PHILIPS
NORTH AMERICA LLC, PHILIPS HOLDING
USA, INC. AND PHILIPS RS NORTH
AMERICA, LLC,

          Defendants.

Case No.   2:21-cv-1073

JURY TRIAL DEMANDED

**CLASS ACTION COMPLAINT**

## CLASS ACTION COMPLAINT

Plaintiff Rhonda Maston-Meadows ("Plaintiff") brings this class action against Koninklijke Philips N.V. ("Royal Philips"), Philips North America LLC ("Philips NA"), Philips Holdings USA, Inc. ("PHUSA"), and Philips RS North America, LLC ("Philips RS") (collectively "Philips" or "Defendants"), alleging as follows:

## INTRODUCTION

1.    Defendants manufacture and distribute a variety of sleep apnea therapy products and solutions[1] across the United States, including millions of continuous positive airway pressure ("CPAP") machines, bilevel positive airway pressure ("BiPAP") machines, and mechanical ventilators (collectively "the Devices").

---

[1] https://www.usa.philips.com/c-e/hs/sleep-apnea-therapy/explore-our-sleep-apnea-solutions (last accessed July 30, 2021).

2.      On April 26, 2021, Philips disclosed ongoing issues with the Devices to its investors in its first quarterly report for 2021.[2]

3.      In this report, Philips disclosed that it had determined from user reports and testing that there were risks to users related to the degradation of polyester-based polyurethane ("PE-PUR") sound abatement foam used in "certain of Philips' sleep and respiratory care devices currently in use."

4.      Nearly two months after disclosing the issues to their investors, on June 14, 2021, Defendants disclosed the risks associated with the sound abatement foam to the users of the Devices by issuing a voluntary recall.[3]

5.      These risks include that the PE-PUR foam may degrade into particles which may enter the Device's air pathway and be ingested or inhaled by the user as well as the risk that the foam may off-gas certain chemicals.

6.      Philips further advised in its recall notice that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."

7.      Patients with CPAP and BiPAP machines were advised to discontinue use of the machines except in circumstances where there was a lack of alternatives.

8.      Users of life-sustaining mechanical ventilators were advised not to stop the therapy without consulting a physician.

---

[2] https://www.results.philips.com/publications/q121 (last accessed August 3, 2021).
[3] https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last accessed July 30, 2021).

9. There have been more than 100 reported injuries and more than 1,200 complaints made to the FDA.[4]

10. Philips has indicated that they will repair or replace the Devices, but anticipates that it will take a year to complete replacement of the recalled devices,[5] leaving CPAP and BiPAP machine users to either risk not using the device for an unknown period of time or to spend money out of pocket to get a different device. Users of mechanical ventilators will have to continue to use the devices despite the clear risks to their health.

11. Plaintiff purchased one of the Devices, a DreamStation, in November 2018.

12. After learning of the recall, Plaintiff became concerned and ceased using her machine. Her insurance company has indicated that it will not cover the cost of a replacement machine until November 2021 at the earliest.

13. Since being notified of the recall, Plaintiff has experienced stress concerning the serious health risks she is facing from possible exposure to off-gassed or degraded PE-PUR Foam in the Devices, including the Dreamstation Auto CPAP used by Plaintiff.

## THE PARTIES

14. Plaintiff Rhonda Maston-Meadows, is a resides in Jefferson County, Alabama and is a citizen of Alabama.

15. Plaintiff purchased a Device, a Philips DreamStation, prior to June 14, 2021.

16. Defendant Royal Philips is a Dutch multinational corporation with its principal place of business located in Amsterdam, Netherlands. Royal Philips is the parent company of the

---

[4] https://www.fda.gov/medical-devices/medical-device-recalls/philips-respironics-recalls-certain-continuous-and-non-continuous-ventilators-including-cpap-and (last accessed August 6, 2021).
[5] https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725 (last accessed August 6, 2021).

Philips Group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips owns or controls, directly or indirectly, 100% of its subsidiaries Philips NA and Philips RS. Upon information and belief, Royal Philips controls Philips NA and Philips RS in the manufacturing, selling, distributing, and supplying of the recalled CPAP, Bi-Level PAP, and mechanical ventilator devices.

17.    Defendant Philips North America LLC is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141, and is a citizen of Massachusetts. Philips NA is a wholly owned subsidiary of Royal Philips. Upon information and belief, Philips NA manages the operation of Royal Philips' various lines of business, including Philips RS, in North America. The sole member of Philips NA is PHUSA, which is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141.

18.    Defendant Philips Holding USA, Inc is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141 and is a citizen of Massachusetts. PHUSA is a holding company that is the sole member of Defendant Philips NA.

19.    Defendant Philips RS North America LLC is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206 and is a citizen of Pennsylvania. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an

aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.§ 1367.

21.     Venue is proper because Philips RS North America LLC (formerly Respironics, Inc.) is headquartered in and regularly conducts business in this District and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## GENERAL FACTUAL ALLEGATIONS

22.     Defendants manufacture and distribute millions of CPAP machines BiPAP machines, and mechanical ventilators, including the Devices.

23.     CPAP machines provide a steady flow of oxygen to users' noses and mouths while they sleep, preventing obstructions from blocking airways and causing the frequent waking associated with sleep apnea.

24.     BiPAP machines are ventilators, which improve the level of oxygen in the blood by delivering more air pressure when the user breathes in, and decreasing air pressure when the user breathes out.

25.     Both CPAP and BiPAP machines are relied upon by users with obstructive sleep apnea to relieve the symptoms of their condition, which if left untreated can lead to congestive heart failure, coronary artery disease, stroke, or even death.

26.     On April 26, 2021, Philips disclosed ongoing issues with the Devices to its investors in its first quarterly report for 2021.[6]

---

[6] https://www.results.philips.com/publications/q121 (last accessed August 6, 2021).

27.    In this report, Philips disclosed that it had determined from user reports and testing that there were risks to users related to the degradation of PE-PUR sound abatement foam used in "certain of Philips' sleep and respiratory care devices currently in use."

28.    Nearly two months after disclosing the issues to their investors, on June 14, 2021, Defendants disclosed the risks associated with the sound abatement foam to the users of the Devices by issuing a voluntary recall.[7]

29.    The list of Devices includes:

| Philips CPAP and Bi-Level PAP Devices Manufactured Before April 26, 2021 Subject to Recall[11] | |
| --- | --- |
| **Device Name/Model Type** | **Type** |
| E30 (Emergency Use Authorization) | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| DreamStation ASV | Continuous Ventilator, Non-life Supporting |
| DreamStation ST, AVAPS | |
| SystemOne ASV4 | |
| C Series ASV | |
| C Series S/T and AVAPS | |
| OmniLab Advanced Plus | |
| SystemOne (Q Series) | Non-continuous Ventilator |
| DreamStation | |
| DreamStation GO | |
| Dorma 400 | |
| Dorma 500 | |
| REMStar SE Auto | |

---

[7] https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last accessed August 6, 2021).

| Philips Mechanical Respirator Devices Manufactured Before April 26, 2021 Subject to Recall[12] | |
|---|---|
| **Device Name/Model Type** | **Type** |
| Trilogy 100 Ventilator | Continuous Ventilator |
| Trilogy 200 Ventilator | |
| Garbin Plus, Aeris, LifeVentVentilator | |
| A-Series BiPAP Hybrid A30 | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| Philips A-Series BiPAP V30 Auto | |
| Philips A-Series BiPAP A40 | Continuous Ventilator, Non-life Supporting |
| Philips A-Series BiPAP A30 | Continuous Ventilator, Non-life Supporting |

30.    The Devices were manufactured between April 11, 2007 and April 22, 2021 and distributed between July 21, 2009 and April 22, 2021.

31.    When the PE-PUR foam degrades, black debris from the foam and/or certain chemicals off-gassed during the degradation process may be inhaled or swallowed by the user of the Device.

32.    The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam performed by Philips revealed the presence of potentially harmful chemicals, including Toluene Diamine, Toluene Diisocyanate, and Diethylene glycol.[8]

33.    The foam particles may cause irritation and airway inflammation, which may be particularly risky for patients with underlying lung diseases or reduced cardiopulmonary reserve.

---

[8] https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed August 6, 2021).

34.    The potential symptoms of particulate exposure from degraded foam include irritation (*e.g.*, skin, eye, and respiratory tract), cough, inflammatory response, headache, asthma, chest pressure, sinus infection, other respiratory issues, and adverse effects to other organs (*e.g.*, kidneys and liver), and toxic and carcinogenic effects.[9]

35.    Lab testing completed by Philips also identified the presence of Volatile Organic Compounds (VOCs), which may be emitted as gases from the PE-PUR foam. These VOCs included Dimethyl Diazine and Phenol, 2,6-bis (1,1 dimethylethyl)-4-(1-methypropyl)-.

36.    These VOCs may cause irritation and airway inflammation which may be particularly risky for patients with underlying lung diseases or reduced cardiopulmonary reserve.

37.    The potential symptoms of chemical exposure due to off-gassing include headache/dizziness, irritation (*e.g.*, eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, and toxic and carcinogenic effects.

38.    The risk of the PE-PUR foam degradation may be increased by the use of certain cleaning methods, such as ozone, and high heat and high humidity environments.

39.    Patients with CPAP and BiPAP machines were advised to discontinue use of the machines except in circumstances where there was a lack of alternatives.

40.    Users of life-sustaining mechanical ventilators were advised not to stop the therapy without consulting a physician.

41.    Philips has indicated that they will repair or replace the Devices.

---

[9] https://www.usa.philips.com/healthcare/e/sleep/communications/src-update (last accessed August 6, 2021).

42.     Philips' offer to repair and replace is insufficient to remedy the economic harm created by the money already spent by Plaintiff and the putative class members, as well as medical harm, which may be long-lasting and/or incurable.

43.     Furthermore, Defendants have indicated that the Devices may be repaired under warranty, but that further information regarding replacing the Devices is not yet available.

44.     Philips anticipates that it will take a year to complete replacement of the recalled devices,[10] leaving CPAP and BiPAP machine users to either risk not using the device for an unknown period of time or to spend money out of pocket to get a different device. Users of mechanical ventilators will have to continue to use the devices despite the clear risks to their health.

**PLAINTIFF'S SPECIFIC ALLEGATIONS**

45.     Plaintiff was diagnosed with obstructive sleep apnea in or around 2018.

46.     After receiving a prescription from her doctor, Plaintiff purchased and began using a DreamStation on or around November 2018.

47.     Plaintiff's device is one of the Devices.

48.     Plaintiff used her device daily while sleeping.

49.     At all times, Plaintiff used the device in accordance with the guidelines, manual, and instructions provided with the device as well as those provided by her doctor.

50.     At all times, Plaintiff used her device for a purpose for which the device was marketed, designed, and intended.

51.     Plaintiff learned of the recall from Facebook on or around early July 2021.

52.     Plaintiff ceased using the device on or around early July 2021.

---

[10] https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725 (last accessed August 2, 2021).

53.     Because of her use of the device in the manner by which it was prescribed and according to the manufacturer's instructions, Plaintiff may require significant treatment in the future and now requires constant and continuous medical monitoring and treatment due to the defective nature of the device and/or Defendants' wrongful conduct.

## TOLLING AND ESTOPPEL

### DISCOVERY RULE TOLLING

54.     Plaintiff had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Devices.

55.     Plaintiff could have not discovered, through the exercise of reasonable care, the conduct by Philips alleged herein. Further, Plaintiff did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

56.     For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiff.

### FRAUDULENT CONCEALMENT TOLLING

57.     By failing to provide immediate notice of the adverse health effects associated with continued use of the

58.     Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiff.

59.     Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiff. Plaintiff was unaware of the facts alleged herein without any fault or lack of diligence on her part and could not have reasonably discovered Defendants' conduct. For this

reason, any statute of limitations that otherwise may apply to the claims of Plaintiff should be tolled.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), asserts this action individually and on behalf of a class of:

> All persons in the United States who purchased or used a CPAP, BiPAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021.

61.     Excluded from the class are Defendants, their parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

62.     **Numerosity – Rule 23(a)(1)**. The members of the Class are so numerous that individual joinder of all Class members is impracticable. Approximately four million devices are part of this recall.

63.     **Commonality – Rule 23(a)(2)**. This action involves questions of law and fact that are common to the class members. Such common questions include, but are not limited to:

    a)  whether Defendants owed a duty of care to Plaintiff and the Class;

    b)  whether Defendants knew or should have known that the PE-PUR Foam used for sound abatement posed health risks;

    c)  whether Defendants wrongfully represented that the PE-PUR Foam used for sound abatement in the Devices was safe;

    d)  whether the Devices retained any value post-recall;

    e)  whether Defendants wrongfully represented that theDevices were safe to use;

f)  whether Defendants wrongfully failed to disclose that the PE-PUR Foam used for sound abatement in the Devices posed health risks to Recalled Device users;

g)  whether Defendants' representations and omissions in advertising, warranties, packaging, and/or labeling were false, deceptive, and/or misleading;

h)  whether those representations and omissions were likely to deceive a reasonable consumer;

i)  whether a reasonable consumer would consider the presence, or risk of, health risks as a material fact in purchasing one of the Devices;

j)  whether Defendants had knowledge that those representations and omissions were false, deceptive, and misleading;

k)  whether Defendants breached their express warranties;

l)  whether Defendants breached their implied warranties;

m) whether Defendants engaged in unfair trade practices;

n)  whether Defendants engaged in false advertising;

o)  whether Defendants' conduct was negligent per se;

p)  whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions; and

q)  whether Plaintiff and the members of the Class are entitled to actual, statutory, and punitive damages.

64.    **Typicality – Rule 23(a)(3)**. Plaintiff's claims are typical of the other class members' claims because, among other things, all class members were comparably injured through the uniform prohibited conduct described above. Plaintiff and the putative class suffered uniform

injuries and the legal theories that underpin recovery make the claims of Plaintiff and the members of the class typical of one another.

65.    **Adequacy of Representation – Rule 23(a)(4)**. Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other class members that Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex consumer class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel have adequate financial means to vigorously pursue this action and ensure the interests of the class will not be harmed. Furthermore, the interests of the class members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

66.    **Superiority** – This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class and is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

67.    **Manageability** –While the precise size of the class is unknown at the current moment, the claims of Plaintiff and the class members are substantially identical as explained above. Certifying the case as a class action will centralize these substantially identical claims in a single proceeding and adjudicating these substantially identical claims at one time is the most manageable litigation method available to Plaintiff and the putative class.

**CAUSES OF ACTION**

**COUNT I**
**STRICT PRODUCT LIABILITY- DESIGN DEFECT**
**(on behalf of Plaintiff and the Class)**

68.     Plaintiff incorporates the foregoing allegations as though fully set forth herein.

69.     At all times herein mentioned, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Devices, including Plaintiff's device, which are defective and unreasonably dangerous.

70.     The Devices are defective in their design or formulation in that they are not reasonably fit, suitable, or safe for their intended purpose and/or their foreseeable risks exceed the benefits associated with their design.

71.     The Devices are defective in design because they cause headache/dizziness, irritation (*e.g.*, eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, cough, inflammatory response, asthma, chest pressure, sinus infection, other respiratory issues, and adverse effects to other organs (*e.g.*, kidneys and liver), and have toxic and carcinogenic effects.

72.     The defective condition of the Devices rendered them unreasonably dangerous and/or not reasonably safe, and the Devices were in this defective condition at the time they left the hands of Defendants. Plaintiff's device was expected to and did reach Plaintiff and her physician without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied, and otherwise released into the stream of commerce.

73.     Plaintiff used her device in accordance with the manufacturers and her doctors' instructions and directions.

74.    Plaintiff's device has not been materially altered or modified prior to or during its use by Plaintiff.

75.    Plaintiff's device is defective because the PE-PUR foam can degrade, causing black particles to enter the device and then Plaintiff's airways, and the degradation of the PE-PUR foam leads to off-gassing of hazardous chemicals.

76.    At or before the time the Devices were released on the market and Plaintiff's device was sold to Plaintiff, they possessed the defect that rendered them  unreasonably dangerous.

77.    Defendants could have designed the Devices to make them less prone to causing the above listed health harms, a technically feasible safer alternative design that would have prevented the harm Plaintiff suffered without substantially impairing the function of the device.

78.    Plaintiff and the putative class could not have known, nor could they have discovered through reasonable means, the defects present in the Devices prior to Defendants' recall.

79.    Defendants knew or should have known that the Devices, including Plaintiff's device, would be prescribed to patients and that physicians and patients were relying on them to furnish a suitable device. Further, Defendants knew or should have known that patients for whom the Devices would be used, such as Plaintiff, could be and would be affected by the defective design and composition of the devices.

80.    Defendants researched, designed, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective devices which, when used in their intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers, such as Plaintiff, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff and the class.

81.     As a direct and proximate result of Defendants' placement of the Devices into the stream of commerce and Plaintiff's and the putative class's use of the product as designed, manufactured, sold, supplied, and introduced into the stream of commerce by Defendants, Plaintiff and the putative class suffered serious physical and mental injury, harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

## COUNT II
## STRICT PRODUCT LIABILITY- MANUFACTURING DEFECT
### (on behalf of Plaintiff and the Class)

82.     Plaintiff incorporates the foregoing allegations as though fully set forth herein.

83.     At all relevant times, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the  Devices, including Plaintiff's device, which are defective and unreasonably dangerous.

84.     At all relevant times, Defendants advertised, promoted, marketed, sold, and distributed the Devices, including Plaintiff's device.

85.     Plaintiff's device was expected to and did reach Plaintiff without a substantial change in its condition.

86.     The Devices are more dangerous than other available devices indicated for similar conditions and uses, and the utility of the device does not outweigh its risks.

87.     The Devices deviated, in terms of construction and quality, from the manufacturing specifications or planned output in a manner that made them unreasonably dangerous.

88.     At all relevant times, the Devices, including Plaintiff's device, were defectively and improperly manufactured and designed by Defendants in that Defendants continued to supply consumers with the Devices despite having full knowledge that the devices posed substantial and avoidable bodily injury.

89.     The foreseeable risks of the Devices were known and could have been avoided.

90.     At all relevant times, the Devices were defectively manufactured by Defendants in that their design and formulation is more dangerous than what an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

91.     At all relevant times, Defendants actively deceived users that their use of the Devices posed safety risks that far outweighed any benefits.

92.     Furthermore, the Devices, including Plaintiff's device, were defectively manufactured in that the PE-PUR foam comprising part of the devices can degrade into particles that enter the devices' air pathway and can off-gas certain chemicals. Plaintiff was unknowingly subjected to receiving different doses of toxins, carcinogens, and other deleterious components and contaminants when using Plaintiff's device.

93.     As a direct and proximate result of the Devices' defects as described herein, Plaintiff is facing significant health risks and is enduring significant stress related to the risks to her health caused by Defendants' Devices. Members of the class suffered in substantially similar ways.

### COUNT III
### STRICT PRODUCT LIABILITY- FAILURE TO WARN
### (on behalf of Plaintiff and the Class)

94.     Plaintiff incorporates the foregoing allegations as though fully set forth herein.

95.     At all relevant times, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the  Devices, including Plaintiff's device, which are defective and unreasonably dangerous.

96.     At all relevant times, Defendants advertised, promoted, marketed, sold, and distributed the Devices, including Plaintiff's device.

97.    The Devices were expected to and did reach the usual consumers, handlers, and persons coming into contact with said device without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by the Defendants.

98.    Defendants each had an independent duty and continuing duty to warn the medical community and Plaintiff's physicians about the significance of the risks of physical harm with the Devices.

99.    Plaintiff used her device in a manner intended and foreseeable by Defendants.

100.    The Devices were defective due to inadequate warnings because Defendants knew or should have known that the Devices created an increased risk of bodily harm and failed to warn the medical community, including Plaintiff's doctors, of the nature of such risks.

101.    Defendants omitted and downplayed the significantly increased health risks caused by the Devices that Defendants knew or should have known from previous testing and research even prior to subject device's FDA approval.

102.    The Devices' labeling and warnings were defective because they omitted and inadequately warned of the device's increased health risks.

103.    Although physicians are supposed to weigh the risks and benefits before prescribing a medical device, Defendants knew that their deliberate omissions would cause physicians, including Plaintiff's physicians, to prescribe the Devices without being able to adequately weigh the health risks.

104.    Defendants' failure to warn existed even after the recall was issued, as they took no steps to inform Plaintiff's doctors of the recall.

105.    If Defendants would have properly warned about the Devices' health risks, no reasonable physician, including Plaintiff's physicians, would have recommended or prescribed the

Devices because the potential benefits of less troubled sleep are significantly outweighed by the health risks inherent with these Devices.

106.    Had Defendants reasonably provided adequate warnings of the health risks, such warnings would have been heeded and no healthcare professional, including Plaintiff's physicians, would have prescribed the Devices and no consumer, including Plaintiff, would have purchased and/or used the Devices.

107.    As a direct and proximate result of the Devices' defects as described herein, Plaintiff is facing significant health risks and is enduring significant stress related to the risks to her health caused by Defendants' Devices. Members of the class suffered in substantially similar ways.

**COUNT IV**
**NEGLIGENCE**
**(on behalf of Plaintiff and the Class)**

108.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

109.    Defendants had a duty to individuals, including Plaintiff, to use reasonable care in designing, manufacturing, marketing, labeling, packaging, and selling the Devices, including Plaintiff's device.

110.    Defendants were negligent in failing to use reasonable care as described herein in designing and manufacturing the Devices, including Plaintiff's device. Defendants breached their aforementioned duty by:

  a) Failing to design the Devices, including Plaintiff's device, so as to avoid an unreasonable and increased risk of harm of cancer and other injuries in users;

  b) Failing to design the Devices, including Plaintiff's device, flawed polyurethane PE-PUR sound abatement foam that could degrade and infiltrate the device's air

pathway while the user is sleeping, exposing them to increased and unnecessary health risks;

c) Manufacturing the Devices, including Plaintiff's device, with a specific lot and/or lots of flawed polyurethane PE-PUR sound abatement foam that could degrade and infiltrate the device's air pathway while the user is sleeping, exposing them to increased and unnecessary health risks; and

d) Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging, and/or selling the Devices, including Plaintiff's device

111. Defendant also negligently failed to warn or instruct Plaintiff and the putative class regarding the following issues:

a) the Devices, including Plaintiff's device, were manufactured with flawed polyurethane PE-PUR sound abatement foam which degrades and infiltrates the device's air pathway while the user is sleeping, exposing them to increased health risks;

b) the Devices, including Plaintiff's device, were manufactured with flawed polyurethane PE-PUR sound abatement foam which off-gasses toxic chemicals exposing users to increased health risks;

c) the risk of chronic inflammation resulting from use of the Devices, including Plaintiff's device;

d) the risk of chronic infections resulting from the Devices, including Plaintiff's device;

e) the risk of lung, kidney, and/or rectal cancers from exposure to the foam;

    f)   the need for corrective or revision surgery to adjust or remove cancerous tumors and/or nodules as a result of usage of the Devices, including Plaintiff's device; and

    g)   the severity of complications that could arise from use of the Devices, including Plaintiff's device.

112.    As a direct and proximate result of the Devices' defects as described herein, Plaintiff is facing significant health risks and is enduring significant stress related to the risks to her health caused by Defendants' Devices. Members of the class suffered in substantially similar ways.

**COUNT V**
**NEGLIGENT MISREPRESENTATION**
**(on behalf of Plaintiff and the Class)**

113.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

114.    Defendants had a duty to exercise reasonable care to those whom they provided device information about the Devices and to all those relying on the information provided, including Plaintiff, his healthcare providers, and the public in general that the Devices had been tested and found to be safe and effective for treating sleep apnea.

115.    Defendants, in the course of selling the Devices, supplied information about the devices through television commercials, advertisements, marketing campaigns, sales representatives, labeling, and warnings.

116.    Defendants breached their duty by misrepresenting the Devices' safety to the medical and healthcare community, to Plaintiff, and the public in general.

117.    Defendants failed to exercise reasonable care because they should have put safety before their profits and provided individuals with the realistic risks and expectations that the Devices could cause serious health risks.

21

118.    Defendants' representations were made without properly conducting sufficient testing and by providing insufficient warnings about the Devices' potential risks.

119.    Defendants' false representations that the Devices were safe for consumers and their failure to disclose material past and existing facts of the Devices' serious health risks were made or omitted with the intent to induce Plaintiff and the public at large to rely upon those facts or omissions.

120.    Plaintiff and the putative class were unaware and did not know that the Devices were unsafe for the purpose of treating sleep apnea because they created significant health risks until after they had been exposed to carcinogenic particles and gasses.

121.    Plaintiff and the Class justifiably relied on the false representations of Defendants.

122.    Had Defendants reasonably and proposed provided adequate warnings of cancer and other serious injuries, such warnings would have been heeded and no healthcare professional, including Plaintiff's physicians, would have prescribed then Devices and no consumer, including Plaintiff, would have purchased and/or used the Devices.

123.    As a direct and proximate result of the Devices' defects as described herein, Plaintiff is facing significant health risks and is enduring significant stress related to the risks to her health caused by Defendants' Devices. Members of the class suffered in substantially similar ways.

### COUNT VI
### FRAUD
### (on behalf of Plaintiff and the Class)

124.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

125.    At all relevant times, Defendants designed manufactured, assembled, inspected, tested, packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold, and/or otherwise placed the Devices into the stream of commerce.

126.    Defendants knowingly made fraudulent statements regarding the safety of the Devices and the substantial health risks associated with using the devices, all the while intending to deceive Plaintiff and the general public.

127.    At all relevant times, Defendants fraudulently misrepresented the Devices as safe, when in fact the devices posed unreasonable risks of substantial bodily injury. Due to these and other features, the Devices are not fit for their ordinary, intended use as treatment devices for sleep apnea and similar respiratory conditions.

128.    Defendants touted the Devices as safe, despite a failure to adequately research or test the devices to assess their safety prior to marketing and promoting their use.

129.    Defendants further falsely represented the nature and risks associated with the Devices, and their marketing and strategy regarding the same, in general statements to the media, general public, and federal agencies, including the FDA.

130.    Defendants' fraudulent misrepresentations and omissions were material facts that were essential to Plaintiff's and the class's decision to purchase their Devices.

131.    Plaintiff and the putative class were unaware that Defendants were knowingly concealing these material facts, which Plaintiff and the class relied on to their detriment.

132.    Plaintiff and the putative class justifiably relied to their detriment on Defendants' fraudulent statements.

133.    Had Plaintiff and the putative class been adequately informed of the material facts concealed from them regarding the safety of the subject device, and not intentionally deceived by Defendants, they would not have acquired/purchased or used their Devices.

**COUNT VII**
**PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 Pa. Cons. Stat. Ann. §§ 201-1, *et seq.***
**(on behalf of Plaintiff and the Class)**

134.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

135.    At all times mentioned herein, Defendants' engaged in "trade" or "commerce" in Pennsylvania, as defined by 73 Pa. Cons. Stat. Ann. § 201-2(3), in that they advertised, offered for sale, and sold goods, property, or services primarily for personal, family, or household purposes, and advertised, solicited, offered for sale, and sold "services," "property," "article[s]," "commodit[ies]," or "thing[s] of value" in Pennsylvania.

136.    Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTCPL") 73 Pa. Cons. Stat. Ann. § 201-3 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . are hereby declared unlawful."

137.    For the reasons discussed herein, Defendants violated and continues to violate the UTCPL by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by UTCPL §§ 201-1, *et seq.*

138.    Defendants repeatedly advertised on the labels and packing for the Devices, on Philips' websites, and through national advertising campaigns, among other items, that the Devices were safe and fit for human use. Defendants failed to disclose the material information that the PE-PUR foam used in the Devices, and therefore the Devices themselves, were unsafe and unfit for human use.

139.    As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiff and the putative class suffered damages by purchasing their Devices because they would not have purchased their Devices had they known the truth: not only that they received a product that was worthless, but one that was actively harmful to their physical health and well-being.

140.    Defendants' deceptive trade practices caused injury in fact and actual damages to Plaintiff in the form of the loss or diminishment of value of the Devices, including Plaintiff's device, which allowed Defendants to profit at the expense of Plaintiff and the putative class.

141.    The injuries Plaintiff and the putative class sustained were to legally protected interests. The gravity of the harm of Defendants' actions is significant and there is no corresponding benefit to consumers of such conduct.

142.    The losses sustained by Plaintiff and members of the putative class necessarily flow from the misrepresentations and omissions of Defendants.

### COUNT IX
### UNJUST ENRICHMENT
### (on behalf of Plaintiff and the Class)

143.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

144.    Plaintiff and the putative class conferred substantial benefits on Defendants through their purchase of the Devices. Philips knowingly and willingly accepted and enjoyed these benefits.

145.    Defendants either knew or should have known that the payments rendered by Plaintiff and the putative class were given with the expectation that the Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips. As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

146.    Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiff and the putative class.

147.    Plaintiff and the putative class are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

**COUNT X**
**MEDICAL MONITORING**
**(on behalf of Plaintiff and the Class)**

148.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

149.    At all relevant times, the Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold, and/or otherwise placed the Devices into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

150.    Defendants have reported that users of the Devices face risks of serious injury from the degradation of PE-PUR Foam contained in the Devices. Degradation of PE-PUR Foam may be caused by exposure to chemical emissions from the foam material, high heat and high humidity environments in certain regions, and cleaning methods such as ozone may accelerate potential degradation.

151.    When PE-PUR Foam degrades into particles that may enter the device's pathway and be ingested or inhaled by users of the devices, users face significantly increased risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of degraded foam exposure include: irritation (*e.g.*, skin, eye, and respiratory tract), inflammatory response, headache,

asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic and carcinogenic effects.

152.    The off-gassing of chemicals from the PE-PUR Foam contained in the Devices poses risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of exposure to off-gassing from PE-PUR Foam include: headache/dizziness, irritation (*e.g.*, eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

153.    The absence of visible particles does not mean that PE-PUR Foam breakdown has not already begun. Philips has reported that lab analysis of the degraded foam reveals the presence of harmful chemicals including: TDA, TDI, and DEG.[11] TDI is a powerful irritant to the mucous membranes of the eyes and gastrointestinal and respiratory tracts,[12] and has been reported to cause Occupational Asthma.[13] Exposure to TDA may result in ataxia, tachycardia, nausea, vomiting, convulsions, and respiratory depression.[14]  TDA can cause chemical cyanosis (*i.e.*, bluish discoloration of the skin) by converting hemoglobin to methemoglobin. This compound can also

---

[11]  Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed August 6, 2021).

[12]  The National Institute for Occupational Safety and Health (NIOSH) Current Intelligence Bulletin 53, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, DHHS (NIOSH) Publication Number 90-101 (Dec. 1989); *see also* Gunnar Skarping, *et al.*, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*, Dep't of Occupational and Environmental Medicine, University Hospital, S-221 85 Lund, Sweden (1990); https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.

[13]  Bernstein, David I, *Occupational asthma: Definitions, epidemiology, causes, and risk factors*, Wolters Kluwer, UpToDate.com (accessed August 6, 2021).

[14]     NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*; *see also* Skarping, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*; https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/ (last accessed August 6, 2021).

cause fatty degeneration of the liver.[15] TDA and TDI are potential carcinogens.[16] Repeated exposure to DEG has been associated with damage to the kidneys and renal failure.[17]

154.    As a direct and proximate result of Defendants' conduct, Plaintiff and the putative class have been exposed to substantially increased risks of serious injury from off-gassing and/or degradation of PE-PUR Foam in the Devices, which is beyond normal background levels of risk.

155.    As a direct and proximate result of Defendants' conduct, Plaintiff and the putative class have a significantly increased risk of suffering serious injury or contracting a serious latent disease and suffering further injury at an unknown date in the future. Such injuries include cancer and organ failure, among others currently unknown or just being discovered.

156.    Monitoring procedures exist that makes the early detection of damage from degraded and/or off-gassed PE-PUR Foam possible. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

157.    Existing medical research indicates that exposure to TDI, TDA, and DEG, which Philips has found to exist in off-gassed or degraded PE-PUR Foam, can cause serious, life-

---

[15] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity.*
[16] *Id.* ("The excess cancer risk for workers exposed to TDI and TDA has not yet been quantified, but the probability of developing cancer should be decreased by minimizing exposure.").
[17] Greg M. Landry, *Diethylene glycol-induced toxicities show marked threshold dose response in rats*, Toxicology and Applied Pharmacology 282 (2015) 244-251 ("DEG has recently been involved in several mass epidemics of renal failure and death world-wide (O'Brien et al., 1998; Schier et al., 2013). DEG poisoning clinically manifests in metabolic acidosis, hepatotoxicity, renal failure, and peripheral neuropathy, with the hallmark being acute renal failure involving proximal tubule cell necrosis and cortical degeneration (Schep et al., 2009)"); Cohen, Jeffrey A., *Demyelinating Diseases of the Peripheral Nerves*, Nerves and Nerve Injuries (2015) ("When consumed, DEG causes severe systemic and neurologic complications, including coma, seizures, peripheral neuropathy, and hepatorenal failure.").

threatening and permanent injuries. Philips has received reports from users of the Devices of headache, upper airway irritation, cough, chest pressure and sinus infection. The exposure to the defects inherent in the Devices has occurred for users, such as Plaintiff, but the full extent of the injuries will not manifest until later in Plaintiff' life. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiff and the putative class be placed under period diagnostic testing beyond that normally recommended in the absence of use of the Devices.

158.    Plaintiff and the putative class demand judgment against Defendants for medical monitoring damages to diagnose injuries caused by the Devices at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff and the putative class demand judgment against the Defendants jointly and severally for damages, including punitive damages if applicable, to which they are entitled by law, as well as all costs of this action, interest, and attorneys' fees, to the full extent of the law, whether arising under the common law and/or statutory law, including:

a.    Judgment for Plaintiff and against Defendants;

b.    Certification of this action as a class action on behalf of the class pursuant to Federal Rule of Civil Procedure 23;

c.    Designation of Plaintiffs as representatives of the class;

d.    Designation of counsel of record as counsel for the class;

e.    Damages to compensate Plaintiff and the putative class for their injuries, economic losses, and pain and suffering sustained as a result of the use of Defendants' subject device;

f.      Pre and post judgment interest at the lawful rate;

g.      Punitive damages, if applicable, on all applicable Counts as permitted by the law;

h.      A trial by jury on all issues of the case;

i.      An award of attorneys' fees; and

j.      For any other relief as this Court may deem equitable and just, including but not limited to all reliefs prayed for in this Complaint and in the foregoing Prayer for Relief.

## JURY DEMAND

Plaintiff respectfully demands a jury trial on all matters so triable.

Dated: August 12, 2021                    Respectfully submitted,

/s/ *Edwin J. Kilpela*
Gary F. Lynch
glynch@carlsonlynch.com
Edwin J. Kilpela
ekilpela@carlsonlynch.com
Elizabeth Pollock-Avery
eavery@carlsonlynch.com
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15221
T (412) 322-9243
F (412) 231-0246

*Attorneys for Plaintiff*